IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 24-000007-W-CR-RK |
| PETER MCVEY, | |
| Defendant. | |

**PLEA AGREEMENT**

Pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the parties described below have entered into the following plea agreement:

**1. The Parties.**

The United States Attorney's Office for the Western District of Missouri and the United States Department of Justice, Criminal Division, Money Laundering and Asset Recovery Section (collectively, the "Government"), and the defendant, Peter McVey ("the defendant"), represented by Attorney Christopher Joseph.

The defendant understands and agrees that this plea agreement is only between him and the Government, and that it does not bind any other federal, state, or local prosecution authority or any other government agency, unless otherwise specified in this agreement.

**2. Defendant's Guilty Plea.** The defendant agrees to, and hereby does plead guilty to, Count One of the information, charging him with a violation of 31 U.S.C. §§ 5318(h) and 5322(b) and (e), and 18 U.S.C. § 2, that is, aiding and abetting the willful failure to implement and maintain an appropriate anti-money laundering program. A copy of the information is attached as Exhibit

A. By entering into this plea agreement, the defendant admits that he intentionally and voluntarily committed this offense, and he is, in fact, guilty of this offense.

**3. Factual Basis for Guilty Plea.** The parties agree that the facts constituting the offense to which the defendant is pleading guilty are as follow:

> The Defendant, PETER MCVEY ("MCVEY"), admits that from in or about April 2014, and continuing thereafter until in about July 2022, in the Western District of Missouri and elsewhere, he willfully, voluntarily and intentionally aided and abetted BANK-1, BANK OFFICIAL-1, and BANK OFFICIAL-2 in their willful failure to maintain an appropriate Anti-Money Laundering Program, in violation of Title 31, United States Code, Sections 5318(h) and 5322(b) and (e); and Title 18, United States Code, Section 2.
>
> MCVEY admits that in or about 2013, he was actively recruited by BANK OFFICIAL-1 and BANK OFFICIAL-2 to manage BANK-1's Automated Clearing House ("ACH") processing systems for certain high-risk customers that BANK-1 intended to onboard in the near future. MCVEY recalls during an interview with BANK OFFICIAL-1 and BANK OFFICIAL-2 that BANK OFFICIAL-2 told him that it was BANK-1's goal to be a "billion dollar asset bank" as quickly as possible and to achieve this goal, BANK-1 planned to onboard and provide financial services to certain high-risk customers that had been pushed out of the banking system by other banks.
>
> MCVEY admits that he worked for BANK-1 as its Vice President and Director of Treasury Services from in or about April 2014 to in or about July 2022. MCVEY admits that within his first 90 days to six months on the job at BANK-1, the bank entered into a Memorandum of Understanding ("MOU") with the Federal Deposit Insurance Corporation ("FDIC") concerning the bank's compliance with the Bank Secrecy Act ("BSA").
>
> MCVEY admits that pursuant to federal law and the corrective measures contained within the MOU, BANK-1 was required to follow and/or comply with all BSA requirements and its promulgated regulations, as well as implement an appropriate Anti-Money Laundering Program in accordance with 31 U.S.C. § 5318, which focused on more scrutiny and resources – not less – toward high-risk customers.
>
> MCVEY admits that prior to, and during, his employment with BANK-1, BANK OFFICIAL-1 and BANK OFFICIAL-2 sought out and onboarded numerous high-risk customers, notwithstanding the potential risks these customers posed to BANK-1.

## BANK-1's High Risk Payday Lending Clients

MCVEY admits that BANK-1 provided banking services to various payday loan businesses, also known as short term online lending ("STOL") businesses, that were owned, managed, and operated by ATTORNEY-2 and INDIVIDUAL-1. MCVEY admits that BANK-1's internal documentation reflects that BANK-1's ability to accept these various entities as banking customers was premised on the basis that these entities were purported to be wholly owned by various Native American tribes. MCVEY, however, admits that many of these entities engaged in "rent-a-tribe" schemes whereby these entities were, in fact, owned, managed, and operated by ATTORNEY-2, INDIVIDUAL-1, and various other non-tribal individuals operating at their direction.

MCVEY admits that, by in or around 2013, he understood that such "rent-a-tribe" schemes, in which non-tribal individuals would issue high interest payday loans purportedly on behalf of Native American tribal business entities for the purpose of evading usury laws, were illegal. In or around 2013, MCVEY discussed with BANK OFFICIAL 1 and BANK OFFICIAL 2 that the Department of Justice was then investigating certain U.S. financial institutions for providing banking services to high-risk customers engaged in such illicit conduct.

MCVEY admits that in or about the end of 2016, officials at BANK-1 quickly opened multiple bank accounts for ATTORNEY-2's and INDIVIDUAL-1's various payday loan entities that were suspected of operating under a "rent-a-tribe" scheme while BANK-1's BSA Officer was out of the office. MCVEY admits that ATTORNEY-2 and an individual working on behalf of INDIVIDUAL-1 expressed a need to open these accounts quickly because another bank in the Kansas City area had informed ATTORNEY-2 and INDIVIDUAL-1 that they would no longer provide banking services to them or their businesses. ATTORNEY-2 and INDIVIDUAL-1's businesses claimed an affiliation with STOL portfolios purportedly owned and managed by TRIBAL LENDING ENTITY-2 and TRIBAL LENDING ENTITY-3.

MCVEY admits that in addition to maintaining bank accounts on behalf of these "rent-a-tribe" entities, BANK-1 provided treasury services to the entities, including sending money constituting the loan advances to the STOL customers, as well as debiting the STOL customers' bank accounts through ACH processing. MCVEY admits that he was aware at that time that U.S. financial institutions were being advised by regulators to limit the amount and volume of ACH transactions processed on behalf of a given client or clients, and that ACH limits exist as an anti-money laundering measure. MCVEY admits that as part of its anti-money laundering policies, BANK-1 imposed daily limits on the amount and volume of the ACH transactions that it would transact for particular customers, including payday lending customers. As part of this policy, bank officials were required to

obtain authorization from beneficial owners and authorized signers of those account holders in order to exceed the daily ACH limits.

MCVEY admits that on October 12, 2018, an employee working on behalf of an entity owned and operated by ATTORNEY-2 and INDIVIDUAL-1 sent to BANK-1 a form entitled Amendment to ACH Agreement, which permitted BANK-1 to process ACH debits of STOL borrowers' accounts in excess of the $400,000 daily limit imposed on this account. MCVEY admits that these attached forms were related to bank accounts opened in the name of TRIBAL LENDING ENTITY-2 and TRIBAL LENDING ENTITY-3 and contained clear forgeries of the signatures of tribal officials associated with those respective entities. An employee of BANK-1 forwarded the email and attached documents that contained the forged signatures to MCVEY and BANK OFFICIAL-1. Upon receipt of this email, MCVEY forwarded this email to another employee of the entity owned and operated by ATTORNEY-2 and INDIVIDUAL-1, writing, "[i]n the two attached requests, someone has laid a previous signature from a completely different piece of paper on top of today's request. This doesn't look great for many reasons. Can you create a different process whereby they are signed by the two signers or something better than this?" Notwithstanding this acknowledged forgery, MCVEY advised this individual that BANK-1 would "forgo the forms today" and would approve the ACH limit increase despite the forgeries. MCVEY further admits that he never spoke with the tribal officials whose signatures were forged on these documents regarding the forgeries, nor did he advise federal or state regulators that he and BANK OFFICIAL-1 had received documents which included forged signatures of tribal officials that managed and operated these purportedly "wholly owned" tribal lending entities.

MCVEY admits that one requirement of an anti-money laundering program is to know your customer and another requirement is to file suspicious activity reports, which he willfully failed to follow here. Additionally, McVey admits that these false and fraudulent statements affected a financial institution, that is, BANK-1, as well as the financial institutions which held the payday lending borrowers' accounts that were debited as a result of BANK-1's willingness to process these transactions notwithstanding BANK-1's receipt of forged documents authorizing an expansion of the entities' increased daily ACH limit.

### BANK-1's High-Risk Deceptive "Sweepstakes" Clients

MCVEY admits that BANK-1 provided banking services to various entities that engaged in high risk, deceptive "sweepstakes," or prize promotion businesses, that were owned, managed, and operated by INDIVIDUAL-3 and INDIVIDUAL-4. MCVEY admits that these entities were initially designated by BANK-1 to be gambling businesses because of their gaming and lottery nature and the deceptive "sweepstakes" and prize promotion offerings. Due to the nature of these businesses,

4

and other "red flags," including continued customer complaints, those entities were considered high-risk customers by BANK-1.

MCVEY admits that on or about November 10, 2014, BANK OFFICIAL-1 emailed INDIVIDUAL-4, copying MCVEY, regarding a request for INDIVIDUAL-4 to obtain an attorney opinion letter as to the legality of its business activities. BANK OFFICIAL-1 wrote, "Here is a sample of the language we are looking for in an opinion letter." This email included an attachment of a sample letter directed to the bank which already included the conclusions that INDIVIDUAL-4's "[sweepstakes and contest] business operations are in compliance with all applicable laws, statutes, and regulations of the United States and the States in which [customer] does business," and that, "[t]o the best of our knowledge, no legal or administrative proceeding is pending or threatened which would materially adversely affect [customer] or [customer's] sweepstakes and contest business operations." Two weeks later, BANK OFFICIAL-1 emailed INDIVIDUAL-4, copying MCVEY, writing, "I have reviewed the sample letter you dropped by my office prepared by [law firm of ATTORNEY-1]. A signed letter from the firm will be more than adequate for our needs. Thanks for your cooperation and understanding in obtaining this information for our due diligence files."

MCVEY admits that, in or about July 2016, he exchanged a series of emails with individuals working for the deceptive "sweepstakes" and prize promotion entities owned by INDIVIDUAL-3 and INDIVIDUAL-4 relating to various checks that were flagged for review pursuant to guidance promulgated by the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"). On or about July 21, 2016, INDIVIDUAL-4 emailed MCVEY, copying BANK OFFICIAL-1, advising that "[w]e do not ask for customers date of birth for any transaction, and that the request to put a customer's name on a spreadsheet for each item is "time consuming for us." On or about that same date, BANK OFFICIAL-1 replied, writing "[h]opefully, this will work out so you can collect some of the money you have had to eat due to the business rules with PacNet. Let's give it a try for a couple of months and circle back and see if it is beneficial…My hope was that you would mail the deposit, we put the money in your account and didn't have to do anything. If it ends up being too much work for you and us, we can decide what to do." The PacNet Group was a Canadian payment processor that processed foreign checks on behalf of the deceptive "sweepstakes" businesses that were owned and operated by INDIVIDUAL-3 and INDIVIDUAL-4

MCVEY further admits that in or about late September 2016, BANK-1 received notice that OFAC designated the PacNet Group to be a significant transnational criminal organization.

On or about September 30, 2016, BANK-1's BSA Officer emailed MCVEY and copied BANK OFFICIAL-1 with a list of items for one of the entities owned by INDIVIDUAL-3 and INDIVIDUAL-4 to address "[a]s part of the annual customer

5

review." This list included the OFAC order against PacNet, a Better Business Bureau "F" rating and dozens of consumer complaints, and a description of the types of sweepstakes and contests the entity engages in and "to whom they are marketed (demographic groups)."

On or about November 21, 2016, another bank's representative emailed MCVEY advising that they would "need to understand more clearly the relationship between [BANK-1] and [entity owned by INDIVIDUAL-3 and INDIVIDUAL-4] and PacNet before we proceed. The appearance of PacNet as an OFAC hit has created the need for re-examination of the relationships between [BANK-1] and any clients you would intend to process transactions through" this other bank.

On April 6, 2017, MCVEY sent an email to INDIVIDUAL-4, copying BANK OFFICER-1, writing, "[BANK OFFICIAL-1] asked me to send to you all the due diligence information we provided to [another bank] last fall."

MCVEY further admits that on or about April 11, 2017, BANK-1 received legal process relating to OFAC's designation of PacNet.

MCVEY admits that he emailed a form to INDIVIDUAL-3 and INDIVIDUAL-4 on April 21, 2017, for the purpose of exempting BANK-1 from filing Currency Transaction Reports ("CTRs") with FinCEN on behalf of a purported sweepstakes entity they owned. MCVEY further admits he sent three additional emails with separate forms to INDIVIDUAL-4 between on or about April 24, 2017, and on or about April 26, 2017, for the purpose of exempting BANK-1 from filing CTRs with FinCEN on behalf of three other deceptive sweepstakes entities owned by INDIVIDUAL-3 and INDIVIDUAL-4. MCVEY further admits that each of the three attached forms contained false statements, and that he knew the statements were false at that time because these four deceptive "sweepstakes" or prize promotion customers engaged in business activities that were ineligible for CTR exemptions.

MCVEY further admits that BANK OFFICIAL-1 was insistent that INDIVIDUAL-3 and INDIVIDUAL-4 continue to have easy access to financial services provided by BANK-1.

**4. Use of Factual Admissions and Relevant Conduct.** The defendant acknowledges, understands, and agrees that the admissions contained in Paragraph 3 and other portions of this plea agreement will be used for the purpose of determining his guilt and advisory sentencing range under the United States Sentencing Guidelines ("U.S.S.G."), including the calculation of the defendant's offense level in accordance with U.S.S.G. §§ 2S1.3 and 3B1.1

6

## 5. Statutory Penalties.

The defendant understands that upon his plea of guilty to Count One of the above-captioned information, charging a violation of 31 U.S.C. §§ 5318(h) and 5322(b) and (e), and 18 U.S.C. § 2, the following statutory penalties are applicable:

    a.    Maximum term of imprisonment: 10 years (31 U.S.C. § 5322).

    b.    Minimum term of imprisonment: 0 years (31 U.S.C. § 5322).

    c.    Maximum supervised release term: 3 years, to follow any term of imprisonment; if a condition of release is violated, the defendant may be sentenced to up to 2 years without credit for pre-release imprisonment or time previously served on post-release supervision (18 U.S.C. § 3583 (b) & (e)).

    d.    Maximum fine: $500,000 (31 U.S.C. § 5322(b)); an additional amount equal to the profit gained from the offense (31 U.S.C. § 5322(e)).

    e.    Restitution: N/A

    f.    $100 special assessment (18 U.S.C. § 3013).

**6. Sentencing Procedures.** The defendant acknowledges, understands, and agrees to the following:

    a. in determining the appropriate sentence, the Court will consult and consider the United States Sentencing Guidelines promulgated by the United States Sentencing Commission; these Guidelines, however, are advisory in nature, and the Court may impose a sentence either less than or greater than the defendant's applicable Guidelines range, unless the sentence imposed is "unreasonable";

    b. the Court will determine the defendant's applicable Sentencing Guidelines range at the time of sentencing;

    c. in addition to any sentence of imprisonment, the Court may impose a term of supervised release of up to one year; and that the Court must impose a period of supervised release if a sentence of imprisonment of more than one year is imposed;

    d. if the defendant violates a condition of his supervised release, the Court may revoke his supervised release and impose an additional period of imprisonment

7

of up to two years pursuant to 18 U.S.C. § 3583(e)(3) without credit for time previously spent on supervised release. In addition to a new term of imprisonment, the Court also may impose a new period of supervised release, the length of which cannot exceed two years pursuant to 18 U.S.C. § 3583(h), less the term of imprisonment imposed upon revocation of the defendant's first supervised release;

e. the Court may impose any sentence authorized by law, including a sentence that is outside of, or departs from, the applicable Sentencing Guidelines range;

f. any sentence of imprisonment imposed by the Court will not allow for parole;

g. the Court is not bound by any recommendation regarding the sentence to be imposed or by any calculation or estimation of the Sentencing Guidelines range offered by the parties or the United States Probation Office;

h. the defendant may not withdraw his guilty plea solely because of the nature or length of the sentence imposed by the Court;

i. The defendant agrees that the United States may institute civil, judicial or administrative forfeiture proceedings against all forfeitable assets in which the defendant has an interest, and that he will not contest any such forfeiture proceedings;

j. Within 10 days of the execution of this plea agreement, at the request of the Government, the defendant agrees to execute and submit (1) a Tax Information Authorization form; (2) an Authorization to Release Information; (3) a completed financial disclosure statement; and (4) copies of financial information that the defendant submits to the U.S. Probation Office. The defendant understands that the United States will use the financial information when making its recommendation to the Court regarding the defendant's acceptance of responsibility; and

k. The Government and the defendant agree that, pursuant to 31 U.S.C. § 5322(e), the imposition of a fine in the amount of $20,000 against defendant is appropriate. This amount reflects the total bonus paid to the defendant by BANK-1 for the year 2018, which equals the profit gained by defendant by reason of the offense to which he is pleading guilty under Count One of the Information. The criminal fine will be paid within 10 days of the entry of judgment

**7. Government's Agreements.** Based upon evidence in its possession at this time, the Government, as part of this plea agreement, agrees not to bring any additional charges against the defendant for any federal criminal offenses related to wire fraud, wire fraud conspiracy, money

8

laundering, false bank entries, or any other Bank Secrecy Act violations while the defendant was employed at BANK-1 between 2014 and 2022, for which it has venue and which arose out of the defendant's conduct described above.

The defendant understands that this plea agreement does not foreclose any prosecution for an act of murder or attempted murder, an act or attempted act of physical or sexual violence against the person of another, or a conspiracy to commit any such acts of violence or any criminal activity of which the Government has no knowledge.

The defendant recognizes that the Government's agreement to forego prosecution of all of the criminal offenses with which the defendant might be charged is based solely on the promises made by the defendant in this agreement. If the defendant breaches this plea agreement, the Government retains the right to proceed with the original charges and any other criminal violations established by the evidence. The defendant expressly waives his right to challenge the initiation of the dismissed or additional charges against him if he breaches this agreement. The defendant expressly waives his right to assert a statute of limitations defense if the dismissed or additional charges are initiated against him following a breach of this agreement. The defendant further understands and agrees that if the Government elects to file additional charges against him following his breach of this plea agreement, he will not be allowed to withdraw his guilty plea.

**8. Preparation of Presentence Report.** The defendant understands the Government will provide to the Court and the United States Probation Office a Government version of the offense conduct. This may include information concerning the background, character, and conduct of the defendant, including the entirety of his criminal activities. The defendant understands these disclosures are not limited to the count to which he has pleaded guilty. The Government may respond to comments made or positions taken by the defendant or the defendant's counsel and to

9

correct any misstatements or inaccuracies. The Government further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject only to any limitations set forth in this plea agreement. The Government and the defendant expressly reserve the right to speak to the Court at the time of sentencing pursuant to Rule 32(i)(4) of the Federal Rules of Criminal Procedure.

9. **Withdrawal of Plea.** Either party reserves the right to withdraw from this plea agreement for any or no reason at any time prior to the entry of the defendant's plea of guilty and its formal acceptance by the Court. In the event of such withdrawal, the parties will be restored to their pre-plea agreement positions to the fullest extent possible. However, after the plea has been formally accepted by the Court, the defendant may withdraw his plea of guilty only if the Court rejects the plea agreement or if the defendant can show a fair and just reason for requesting the withdrawal. The defendant understands that if the Court accepts his plea of guilty and this plea agreement but subsequently imposes a sentence that is outside the defendant's applicable Sentencing Guidelines range or imposes a sentence that the defendant does not expect, like or agree with, he will not be permitted to withdraw his plea of guilty.

10. **Agreed Guidelines Applications.** With respect to the application of the Sentencing Guidelines to this case, the parties stipulate and agree as follows:

   a. The Sentencing Guidelines do not bind the Court and are advisory in nature. The Court may impose a sentence that is either above or below the defendant's applicable Guidelines range, provided the sentence imposed is not "unreasonable";

   b. The parties agree to the following Guidelines calculations:

   Base Offense Level (§ 2S1.3(a)(1))                              8

   Plus:   Pattern of Unlawful Activity (§ 2S1.3(b)(2))           +2

10

Case 4:24-cr-00007-RK   Document 8   Filed 01/17/24   Page 10 of 18

Minimum adjusted offense level: <u>10</u>

There is no other agreement between the parties regarding the scoring of the guidelines, and the government is free to argue the applicability of enhancements under U.S.S.G §§ 3B1.1 and 3B1.3 at the sentencing hearing.

c. There is no agreement between the parties regarding the defendant's criminal history category. The parties agree that the Court will determine his applicable criminal history category after receipt of the presentence investigation report prepared by the United States Probation Office;

d. The defendant understands that the agreement of the parties with respect to the Guidelines computation set forth in the subsections of this paragraph does <u>not</u> bind the Court or the United States Probation Office with respect to the appropriate Guidelines levels. Additionally, the failure of the Court to accept these stipulations will not, as outlined in Paragraph 9 of this plea agreement, provide the defendant with a basis to withdraw his plea of guilty;

e. The United States agrees not to seek an upward departure from the Guidelines. The agreement by the United States to not seek a departure from the Guidelines is not binding upon the Court or the United States Probation Office and the Court may impose any sentence authorized by law, including any sentence outside the applicable Guidelines range that is not "unreasonable";

f. The defendant consents to judicial fact-finding by a preponderance of the evidence for all issues pertaining to the determination of the defendant's sentence, including the determination of any mandatory minimum sentence (including the facts that support any specific offense characteristic or other enhancement or adjustment), and any legally authorized increase above the normal statutory maximum. The defendant waives any right to a jury determination beyond a reasonable doubt of all facts used to determine and enhance the sentence imposed and waives any right to have those facts alleged in the indictment. The defendant also agrees that the Court, in finding the facts relevant to the imposition of sentence, may consider any reliable information, including hearsay.

**11. Effect of Non-Agreement on Guidelines Applications.** The parties understand, acknowledge, and agree that there are no agreements between the parties with respect to any Sentencing Guidelines issues other than those specifically listed in Paragraph 10, and its subsections. As to any other Guidelines issues, the parties are free to advocate their respective positions at the sentencing hearing.

**12. Change in Guidelines Prior to Sentencing.** The defendant agrees that if any applicable provision of the Guidelines changes after the execution of this plea agreement, then any request by defendant to be sentenced pursuant to the new Guidelines will make this plea agreement voidable by the United States at its option. If the Government exercises its option to void the plea agreement, the United States may charge, reinstate, or otherwise pursue any and all criminal charges that could have been brought but for this plea agreement.

**13. Government's Reservation of Rights.** The defendant understands that the Government expressly reserves the right in this case to:

    a. oppose or take issue with any position advanced by defendant at the sentencing hearing which might be inconsistent with the provisions of this plea agreement;

    b. comment on the evidence supporting the charge in the information;

    c. oppose any arguments and requests for relief the defendant might advance on an appeal from the sentences imposed and that the United States remains free on appeal or collateral proceedings to defend the legality and propriety of the sentence actually imposed, even if the Court chooses not to follow any recommendation made by the United States; and

    d. oppose any post-conviction motions for reduction of sentence, or other relief.

**14. Waiver of Constitutional Rights.** The defendant, by pleading guilty, acknowledges that he has been advised of, understands, and knowingly and voluntarily waives the following rights:

    a. the right to plead not guilty and to persist in a plea of not guilty;

    b. the right to be presumed innocent until his guilt has been established beyond a reasonable doubt at trial;

    c. the right to a jury trial, and at that trial, the right to the effective assistance of counsel;

    d. the right to confront and cross-examine the witnesses who testify against him;

    e. the right to compel or subpoena witnesses to appear on his behalf; and

    f. the right to remain silent at trial, in which case his silence may not be used against him.

The defendant understands that by pleading guilty, he waives or gives up those rights and that there will be no trial. The defendant further understands that if he pleads guilty, the Court may ask him questions about the offense or offenses to which he pleaded guilty, and if the defendant answers those questions under oath and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making a false statement. The defendant also understands he has pleaded guilty to a felony offense and, as a result, will lose his right to possess a firearm or ammunition and might be deprived of other rights, such as the right to vote or register to vote, hold public office, or serve on a jury.

**15. Waiver of Appellate and Post-Conviction Rights.**

  a. The defendant acknowledges, understands, and agrees that by pleading guilty pursuant to this plea agreement he waives his right to appeal or collaterally attack a finding of guilt following the acceptance of this plea agreement, except on grounds of (1) ineffective assistance of counsel; or (2) prosecutorial misconduct.

  b. The defendant expressly waives his right to appeal his sentence, directly or collaterally, on any ground except claims of (1) ineffective assistance of counsel; (2) prosecutorial misconduct; or (3) an illegal sentence. An "illegal sentence" includes a sentence imposed in excess of the statutory maximum, but does *not* include less serious sentencing errors, such as a misapplication of the Sentencing Guidelines, an abuse of discretion, or the imposition of an unreasonable sentence. However, if the United States exercises its right to appeal the sentence imposed as authorized by 18 U.S.C. § 3742(b), the defendant is released from this waiver and may, as part of the Government's appeal, cross-appeal his sentence as authorized by 18 U.S.C. § 3742(a) with respect to any issues that have not been stipulated to or agreed upon in this agreement.

**16. Financial Obligations.** By entering into this plea agreement, the defendant represents

13

that he understands and agrees to the following financial obligations:

    a. The Government may use the Federal Debt Collection Procedures Act and any other remedies provided by law to enforce any restitution order that may be entered as part of the sentence in this case and to collect any fine.

    b. The defendant will fully and truthfully disclose all assets and property in which he has any interest, or over which the defendant exercises control directly or indirectly, including assets and property held by a spouse, nominee or other third party. The defendant's disclosure obligations are ongoing and are in force from the execution of this agreement until the defendant has satisfied the restitution order in full.

    c. Within 10 days of the execution of this plea agreement, at the request of the Government, the defendant agrees to execute and submit (1) a Tax Information Authorization form; (2) an Authorization to Release Information; (3) a completed financial disclosure statement; and (4) copies of financial information that the defendant submits to the U.S. Probation Office. The defendant understands that compliance with these requests will be taken into account when the Government makes a recommendation to the Court regarding the defendant's acceptance of responsibility.

    d. At the request of the USAO, the defendant agrees to undergo any polygraph examination the United States might choose to administer concerning the identification and recovery of substitute assets and restitution.

    e. The defendant hereby authorizes the Government to obtain a credit report pertaining to him to assist in evaluating the defendant's ability to satisfy any financial obligations imposed as part of the sentence.

    f. The defendant understands that a Special Assessment will be imposed as part of the sentence in this case. The defendant promises to pay the Special Assessment of $100 by submitting a satisfactory form of payment to the Clerk of the Court prior to appearing for the sentencing proceeding in this case. The defendant agrees to provide the Clerk's receipt as evidence of his fulfillment of this obligation at the time of sentencing.

    g. The defendant certifies that he has made no transfer of assets or property for the purpose of (1) evading financial obligations created by this Agreement; (2) evading obligations that may be imposed by the Court; nor (3) hindering efforts of the Government to enforce such financial obligations. Moreover, the defendant promises that he will make no such transfers in the future.

    h. In the event the Government learns of any misrepresentation in the financial disclosure statement, or of any asset in which the defendant had an interest

at the time of this plea agreement that is not disclosed in the financial disclosure statement, and in the event such misrepresentation or nondisclosure changes the estimated net worth of the defendant by ten thousand dollars ($10,000.00) or more, the Government may at its option: (1) choose to be relieved of its obligations under this plea agreement; or (2) let the plea agreement stand, collect the full forfeiture, restitution, and fines imposed by any criminal or civil judgment, and also collect 100% (one hundred percent) of the value of any previously undisclosed assets. The defendant agrees not to contest any collection of such assets. In the event the Government opts to be relieved of its obligations under this plea agreement, the defendant's previously entered pleas of guilty shall remain in effect and cannot be withdrawn.

**17. Waiver of FOIA Request.** The defendant waives all of his rights, whether asserted directly or by a representative, to request or receive, or to authorize any third party to request or receive, from any department or agency of the United States any records pertaining to the investigation or prosecution of this case including, without limitation, any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a.

**18. Waiver of Claim for Attorney's Fees.** The defendant waives all of his claims under the Hyde Amendment, 18 U.S.C. § 3006A, for attorney's fees and other litigation expenses arising out of the investigation or prosecution of this matter.

**19. Defendant's Breach of Plea Agreement.** If the defendant commits any crimes, violates any conditions of release, or violates any term of this plea agreement between the signing of this plea agreement and the date of sentencing, or fails to appear for sentencing, or if the defendant provides information to the Probation Office or the Court that is intentionally misleading, incomplete, or untruthful, or otherwise breaches this plea agreement, the Government will be released from its obligations under this agreement. The defendant, however, will remain bound by the terms of the agreement, and will not be allowed to withdraw his plea of guilty.

The defendant also understands and agrees that in the event he violates this plea agreement,

all statements made by him to law enforcement agents subsequent to the execution of this plea agreement, any testimony given by him before a grand jury or any tribunal or any leads from such statements or testimony shall be admissible against him in any and all criminal proceedings. The defendant waives any rights that he might assert under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that pertains to the admissibility of any statements made by him subsequent to this plea agreement.

**20. Defendant's Representations.** The defendant acknowledges that he has entered into this plea agreement freely and voluntarily after receiving the effective assistance, advice, and approval of counsel. The defendant acknowledges that he is satisfied with the assistance of counsel, and that counsel has fully advised him of his rights and obligations in connection with this plea agreement. The defendant further acknowledges that no threats or promises, other than the promises contained in this plea agreement, have been made by the United States, the Court, his attorneys, or any other party to induce him to enter his plea of guilty.

**21. No Undisclosed Terms.** The parties acknowledge and agree that the above-stated terms and conditions, together with any written supplemental agreement that might be presented to the Court in camera, constitute the entire plea agreement between the parties, and that any other terms and conditions not expressly set forth in this agreement or any written supplemental agreement do not constitute any part of the parties' agreement and will not be enforceable against either party.

**22. Standard of Interpretation.** The parties agree that, unless the constitutional implications inherent in plea agreements require otherwise, this plea agreement should be interpreted according to general contract principles and the words employed are to be given their

16

Case 4:24-cr-00007-RK   Document 8   Filed 01/17/24   Page 16 of 18

normal and ordinary meanings. The parties further agree that, in interpreting this agreement, any drafting errors or ambiguities are not to be automatically construed against either party, whether or not that party was involved in drafting or modifying this agreement.

TERESA A. MOORE
United States Attorney

Dated: 1-17-24

PATRICK D. DALY, Assistant United States Attorney

Dated: 1-17-2024

MATTHEW N. SPARKS, Assistant United States Attorney

MARGARET A. MOESER
Acting Chief, Money Laundering and Asset Recovery Section, U.S. Department of Justice

Dated: 1-17-2024

CHAD M. DAVIS, Trial Attorney, Bank Integrity Unit Money Laundering and Asset Recovery Section, U.S. Department of Justice

17

I have consulted with my attorney and fully understand all of my rights with respect to the offense charged in the Information. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines. I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand this plea agreement and I voluntarily agree to it.

Dated: 17 Jan 2024

_____
PETER McVEY, Defendant

I am Christopher Joseph, the defendant Peter McVey's attorney. I have fully explained to Mr. McVey his rights with respect to the offense charged in the information. Further, I have reviewed with him the provisions of the Sentencing Guidelines which might apply in this case. I have carefully reviewed every part of this plea agreement with him. To my knowledge, Mr. McVey's decision to enter into this plea agreement is an informed and voluntary one.

Dated: 2-17-24

_____
CHRISTOPHER JOSEPH, Attorney for Defendant

18